**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 200348-U

Order filed February 4, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* D.M., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| a Minor | ) | Peoria County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-20-0348 |
| | ) | Circuit No. 16-JA-215 |
| v. | ) | |
| | ) | |
| Sharia N., | ) | |
| | ) | The Honorable |
| Respondent-Appellant). | ) | Timothy J. Cusack, |
| | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justices O'Brien and Wright concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  The circuit court did not err when it found it to be in the minor's best interest to
             terminate the respondent's parental rights.

¶ 2     The circuit court entered orders finding the respondent, Sharia N., to be an unfit parent

and terminating her parental rights to the minor, D.M.  On appeal, Sharia argues that the circuit

court erred when it found it to be in the minor's best interest to terminate her parental rights. We affirm.

¶ 3                                    I.  BACKGROUND

¶ 4        On September 8, 2016, a juvenile petition was filed alleging that the minor (born August 8, 2015) was neglected by reason of an injurious environment for the following reasons: (1) the minor's siblings had been removed from Sharia's custody in Missouri; (2) Sharia had not completed services in Missouri and was refusing to do so; (3) Sharia was bipolar, had anger management problems, and had been "hostile and unstable" when interacting with the Department of Children and Family Services (DCFS) and its employees and assigns; (4) one of the minor's siblings was removed from Sharia's custody in December 2011 in part due to her putting alcohol in that minor's baby bottle; (5) on September 6, 2016, Sharia had been involved in a domestic violence incident in which she was arrested for assaulting her paramour, and that when she was arrested, she left the minor in her paramour's custody; and (6) the minor's father had a criminal history that included 2010 convictions for assault, theft, and burglary. On November 3, 2016, Sharia stipulated through counsel to the petition's allegations.

¶ 5        On November 28, 2016, FamilyCore compiled a report for the dispositional hearing scheduled for early December. The report stated that Sharia was living with her paramour in an apartment in Peoria and that her paramour had an extensive criminal history, including that he was a child sex offender who was no longer required to register. The paramour had reported that he had been convicted of raping a 12-year-old girl when he was 22 years old and that he had served eight-and-a-half years in prison as a result. Additionally, the report noted that since Sharia was arrested on September 6, 2016, she had been involved in "six known incidents of domestic violence, criminal damage to property and indecent exposure." The report further

2

stated that Sharia had been referred for anger management services, was awaiting approval for a psychological evaluation, was awaiting assignment for counseling services, and had been referred for domestic violence classes.

¶ 6        Regarding visitation, Sharia had attended seven of nine weekly, one-hour visits with the minor. The report noted that the minor appeared to struggle with visits in that he would often cry at the sight of Sharia and would hold onto the case aide when entering the visit room and at the sight of Sharia. The minor would somewhat warm up to Sharia by the end of the visit. Further, at the October 21, 2016, visit, Sharia attempted to give the minor chewing gum and did not understand the problem with doing so when told by the case aide to remove the gum. Sharia also would often talk to the minor during visits about her paramour, whom she called "daddy." The report emphasized that Sharia's paramour was not the minor's father.

¶ 7        The report also stated that the minor had been placed in a traditional foster home, had adjusted well to the hoeme, and was "very attached to the foster parent."

¶ 8        On January 26, 2017, the circuit court entered an order adjudicating the minor to be neglected. The court also held a dispositional hearing after which it found Sharia to be unfit due to her "prior issues with [the minor's] siblings in [Missouri]; unresolved serious mental health issues." The minor was made a ward of the court and DCFS was named guardian with the right to place. Sharia was also given several tasks to complete.

¶ 9        On December 11, 2019, the State filed a petition seeking the termination of Sharia's parental rights to the minor, alleging that she had failed to make reasonable progress toward the return of the minor to her care during the nine-month period from October 11, 2018, to July 11, 2019. On February 20, 2020, Sharia stipulated through counsel to the petition's allegations, thereby conceding her unfitness.

3

¶ 10    On June 8, 2020, FamilyCore compiled a best-interest hearing report. At the time of the report, Sharia's last reported address was in Moorhead, Minnesota. In October 2019, she had re-engaged with FamilyCore employees; for the prior nine months, she had no contact with them. She told FamilyCore that she did not contact them during that time because she was in jail. Records obtained by FamilyCore from Texas revealed that Sharia had been convicted of "Assault on Family/ Household Member" in January 2019 and was sentenced to four years of probation. She violated her probation, was arrested in July 2019, and was sentenced in September 2019 to 60 days of incarceration with credit for time served. Regarding the tasks with which she was ordered to complete, Sharia had inconsistent contact with FamilyCore, refused to sign some releases of information, and had been verbally aggressive with the caseworker and her supervisor. She had completed a psychological evaluation but did not appear for random drug testing or complete a substance abuse assessment. She was engaged in counseling in Minnesota and provided documentation that she was taking her medication. She reported that she had an apartment in Moorhead, Minnesota; a search by the caseworker in May 2020 revealed Sharia had an apartment in Minneapolis. Sharia had not been consistent with visitation due to incarceration and lack of contact with FamilyCore, and had displayed inappropriate communication during visits, including that she repeatedly asked the minor to call her mom and to tell her that he loved her.

¶ 11    Regarding the minor, the report stated that he was four years old and had developed well in his foster home. The caseworker stated that the minor appeared happy, bonded, and healthy during her visits to the minor's foster home. He had developed relationships with the foster parent's extended family, was current with medical exams, and was hitting developmental milestones. The foster parent expressed a willingness to adopt the minor. The caseworker stated

4

in the report that the minor had a strong bond with his foster parent and "no meaningful relationship" with Sharia.

¶ 12     On August 6, 2020, the circuit court held a best-interest hearing. The caseworker testified that the minor had been in one foster home since he was taken from Sharia's custody in 2016. The foster parent had enrolled the minor in various activities in the community and the minor had expressed the desire to stay in his foster home. The caseworker also stated that she had last contacted Sharia's counseling center in June of 2020 and had requested progress updates, but no response had been given. Sharia also had provided a copy of her apartment lease to the caseworker. The caseworker also stated that Sharia had not visited with the minor over video since the pandemic hit. Sharia had an in-person visit on the day of the hearing (the first in-person visit since the pandemic hit), which went "fine." At that visit, the minor called Sharia mom after being prompted by Sharia to do so. Sharia acted appropriately at the visit.

¶ 13     Additionally, the caseworker testified regarding what the foster mother reported to her about the minor's behavior after visits:

> "There's just a range. Sometimes he's very emotional.
> He's upset. He definitely expresses that he doesn't want to have
> more visits, and then that's when he's really expressed himself.
> But then there are other times where just behaviorally he'll act out.
> He will throw fits. He will have temper tantrums. Whereas he
> doesn't usually have those behaviors."

The caseworker further stated that the minor had told her that he did not want to return home to Sharia. She said his exact words were, " 'I don't like my brown mommy. She scares me, and I don't want to see her anymore.' "

5

¶ 14	The guardian *ad litem* testified that regarding community ties, the foster parent had her parents and brother in the area and that the minor had a "really good relationship" with them. The minor was also involved with the foster parent's church. In addition, the guardian *ad litem* stated that the minor had told her that " 'I don't like my mom with the brown hair.' "

¶ 15	Sharia testified that she was receiving benefits such that she was able to support the minor in her apartment. She was also engaged in counseling and was taking her medication. She stated that the domestic violence incident that contributed to the minor's removal from her care was with her fiancé. He was currently not living with her, as he was an over-the-road trucker who slept in his truck. She said she had not seen him in over six months. She said that she had not had any domestic violence incidents in a long time.

¶ 16	When asked if she had a bond with the minor, Sharia stated, "My son wouldn't even let me go. He wouldn't even -- he didn't even want to get down. First thing my son said was, 'Hi mama. I missed you. I want to come back home.' " She disagreed with the caseworker assessment that the minor had behavioral issues after visits with her. When asked why it was not in the minor's best interest to terminate her parental rights, she stated:

> "Because that's not his mother. I'm his mother. I've been
> – you don't know – y'all don't know anything about me, nothing.
> I've been raped. I've been spit on. I've been jumped on. I've
> been lied to. I almost got killed in front of my baby back in St.
> Louis. You don't know nothing about me, anything.
>
> I've got my own place. I've been having my own place
> now for two years. I pay my rent. My baby – the bed my baby
> got, I got that. All the clothes my baby just recently got, I bought

6

that. All the food in my house, I bought that. And when I asked

[the Child Welfare Supervisor] for two hours today, she told me,

'Hell no. You can just get one hour.' "

¶ 17 On cross-examination, when Sharia was asked why the minor was in foster care, she responded, "You tell me. You tell me." She further stated, "this did not have anything to do with my baby, nothing. When I say nothing, I mean nothing. I don't allow fighting in my house. I'm very *** strict with my kids, their health and their safety. I don't allow fights. We don't fight."

¶ 18 At the close of the hearing, the circuit court found that it was in the minor's best interest to terminate Sharia's parental rights. Sharia appealed.

¶ 19 II. ANALYSIS

¶ 20 Sharia conceded the State's allegations of unfitness in February 2020 and her sole argument on appeal is that the circuit court erred when it found it was in the minor's best interest to terminate her parental rights.

¶ 21 After a court finds a parent to be unfit, all considerations yield to the best interest of the minor. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). A best-interest determination requires the circuit court to consider the following factors in light of the minor's age and developmental needs:

"(a) the physical safety and welfare of the child, including

food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial,

cultural, and religious;

(d) the child's sense of attachments, including:

7

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child."  705 ILCS 405/1-3(4.05) (West 2016).

The circuit court does not have to make explicit findings regarding each factor, nor reference each factor in its decision. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43.  On review,

the circuit court's best interest determination will be upheld unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53.

¶ 22 Our review of the record in this case reveals that the manifest weight of the evidence supported termination. The evidence showed that the minor was thriving in his foster home. The foster parent was providing for his basic needs and involving him in community activities. The minor had a strong bond with the foster parent; conversely, due to Sharia's own choices about visitation, criminal activities, and residency location, little to no bond existed between her and the minor. The parents and brother of the foster parent also had relationships with the minor. Significantly, the minor had been in this one foster placement since 2016 and the foster parent expressed her desire to adopt the minor, offering D.M. the stability the statute seeks and Sharia did not provide. Under these circumstances, we hold that the manifest weight of the evidence supported a finding that it was in the best interest of the minor to terminate Sharia's parental rights. Accordingly, we hold that the circuit court did not err when it entered its termination order.

¶ 23                                   III.  CONCLUSION

¶ 24 The judgment of the circuit court of Peoria County is affirmed.

¶ 25 Affirmed.